IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No. 12-cv-00483-WYD-KMT

CHRISTIAN AUBIN ROBINSON,

Plaintiff,

v.

OFFICER JEAN KEITA,
DEPUTY JOSEPH ARMIJO,
DEPUTY JESSICA JAQUEZ,
DEPUTY JASON CRUZ, and
THE CITY AND COUNTY OF DENVER, COLORADO,

Defendants.

---

**ORDER ON SUMMARY JUDGMENT**

---

I. INTRODUCTION

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment filed on March 26, 2013. The individual Defendants assert that they are entitled to qualified immunity on Christian Aubin Robinson's ["Robinson"] claims in the Amended Complaint. Defendant City and County of Denver ["Denver"] claims it is entitled to summary judgment on the municipal liability claims. A response to the summary judgment motion was filed on May 20, 2013, and a reply was filed on June 17, 2013.

Additionally, Robinson filed a Notice of Clarification regarding his response on June 26, 2013, along with a Motion to Supplement Response Brief with a Recently Discovered Exhibit and a Notice of Conventionally Submitted Exhibit on July 18, 2013.

A response and a reply to the motion to supplement were both filed on August 7, 2013. The Motion to Supplement Response Brief was granted on August 27, 2013.[1]

## II. FACTUAL BACKGROUND

Before addressing the facts, I note that I have cited only to the facts most relevant to my opinion as they are rather voluminous. I have, however, considered all the facts cited by the parties and evidence related thereto. Also, I have cited to the record only when the facts are disputed.

This is a civil rights suit by Robinson for damages arising out of Denver police and sheriff officers' conduct in allegedly unreasonably arresting and incarcerating him pursuant to a warrant for a twelve (12) day period. (*See* Am. Compl. ¶ 1, ECF No. 44.) Defendants assert that Robinson was arrested on a warrant containing his name and identifying information when he came to the headquarters of the Denver Police Department ["DPD"] in order to try to cure the identity mixup that led to him being named in the warrant.

Robinson's arrest and incarceration arose out of the fact that a person named Michael Cagle ["Cagle"] used Robinson's Colorado Identification ["ID"] card to identify himself to DPD officers when he was arrested in 2009, and identified himself as

---

[1] I note that a motion to dismiss previously filed by Deputies Joseph Armijo, Jessica Jaquez, and Jason Cruz also asserted that they were entitled to qualified immunity with regard to the claims asserted against them. Since this same argument was made in the summary judgment motion, I denied that motion as moot on August 27, 2013. However, the arguments made and authority cited in that motion have been considered in connection with the summary judgment motion.

"Christian Robinson".[2] When Cagle failed to appear at court appearances, a warrant was issued that contained only Robinson's name and information except for a State Identification Number ["SID"] connected to Cagle.

At the time of Cagle's arrest, the Denver Sheriff's Department ["DSD"] took Cagle's unique identifying information and associated much of this information with the arrestee "Christian Robinson", related to Criminal Case No. 09CR6188, including fingerprints, SID number, and mugshot photos belonging to Cagle. The DSD kept the above identifying information regarding the arrest of Cagle on file in various computer systems, including Cagle's fingerprints, SID number and mugshot photos.

The Denver District Court ["state district court"] transmitted warrant information using an electronic system to the DSD on September 8, 2010. The warrant was placed on National Crime Information Center ["NCIC"] and Colorado Crime Information Center ["CCIC"], which are computer databases of information used by criminal justice agencies to access criminal histories and other information.

The warrant that was sent by the state district court to the DSD and the Colorado Bureau of Investigation ["CBI"] on September 8, 2010, contained only Robinson's name, alias, and information except for a SID connected to Cagle. (*See* ECF No. 55, Exs. H and A; *see also* ECF No. 67, Ex. 10.) Cagle's name does not appear on that warrant. (*Id.*) Robinson admitted this in response to the summary judgment motion.[3]

---

[2] Robinson had lost his ID card at some point prior to Cagle's arrest and had not reported it. (ECF No. 53, Ex. C, Robinson Dep. 205:20-207:11.)

[3] Later, however, Robinson supplemented his response with an exhibit showing that the original warrant issued by the state district court on September 8, 2010, listed only Cagle's name as the party subject to the warrant. (ECF No. 77, Ex. 3 at p. 3.) While Robinson asserts in his motion to supplement

The state district court transmits its warrants to the DSD NCIC Unit so that additional identification information may be added, and also for DSD to act as a contact when law enforcement requests a confirmation of the warrant. Warrants are then "packed". Packing is a warrant modification process that involves the DSD taking custody of the warrant, adding/changing information in it, and deciding whether to put it on the NCIC network. (ECF No. 66, Ex. 1, Tafoya Dep. 10:5-11:4, 62:18-25; *see also* ECF No. 53, Ex. K–Packing.")

Mary Goos ["Goos"] is an NCIC Agent for the DSD. Part of her job is to add additional identification information to the warrants she receives from the court. While Goos testified that her job does not include removal of information from the warrant. (ECF No. 53, Ex. L, Goos Dep. 7:5-8:10), Robinson denies this. Prior to a policy change included in Defendants' Exhibit K ("Never change the SID number on original warrant from the court"), Robinson points to testimony that the SID numbers were occasionally (albeit infrequently) changed if they appeared to be incorrect or in conflict with information in a warrant transmitted to the DSD NCIC unit. (ECF No. 66, Ex. 1, Tafoya Dep. 14:11-21, 17:16-18:25, 28:10-22, 61:11-62:1.)

In this case, in the process of "packing" the warrant for distribution, Goos saw that the SID number on the warrant (which belonged to Cagle) did not match the name "Christian Robinson". Thus, she removed the SID belonging to Cagle from the warrant

---

that this original court-issued warrant was intended for Cagle, without mention of any a.k.a. or alternative name of "Christian Robinson", I note that the actual warrant he cites to lists Christian A. Robinson as an a.k.a. name on its second page. (*Id.* at p. 4.) In any event, Robinson has not shown that this original warrant was ever transmitted by the district court to the DSD or CBI. Thus, I find it is not the warrant upon which Robinson was purportedly arrested.

and replaced it with a SID belonging to Robinson which she found using a CCIC/NCIC search. (ECF No. 53, Ex. L, Goos Dep. 8:14-18; ECF No. 66, Ex. 1, Tafoya Dep. 11:19-12:21.)[4] Robinson asserts that this change continued on in the modified warrant that was then distributed to law enforcement, per the standardized packing process. (ECF No. 66, Ex. 1, Tafoya Dep. 62:18-25; *see also* ECF No. 55, Ex. K.)

Goos does not remember the incident or why she changed the SID number, but it was a mistake for her to do this. (ECF No. 53, Ex. L, Goos Dep. 8:14-18, 21:13-22:10, 23:13-20.)[5] It is known to Denver that the most important piece of identification information in a warrant is the SID number. That number allows law enforcement personnel to correctly connect fingerprint, mugshot and other key identifying information to the "body" seized. Both Goos and Denver know that an incorrect adjustment to a warrant during the "packing" process could result in fundamental changes to the warrant, including a change in whom the warrant had been issued for.

Other than this incident, Goos testified she had not changed information on a court warrant. (ECF No. 53, Ex. L, Goos Dep. 8:7-13.) Robinson denies this, noting several circumstances that were identified before his case that involved the need to change seemingly conflicting warrant information that had been sent incorrectly from the state district court. (ECF No. 66, Ex. 1, Tafoya Dep. 16:20-25.) License numbers have been transposed, SID numbers have been transposed, FBI numbers have been

---

[4] Robinson was assigned a SID number before this incident because he had been previously arrested and incarcerated.

[5] Goos also added additional information to the warrant, including Robinson's social security number. This may have been auto-populated into the warrant when the SID number was changed.

incorrectly transmitted, and names have been incorrectly entered. Ruth Tafoya ["Tafoya"], the NCIC supervisor at the DSD, testified that the need to make changes is very infrequent—she had only seen a change to the SID number two or three times. (*Id*. 14:11-15:3, 17:2-15, 19:23-20:5.)

Goos testified that any problem with conflicting or erroneous information is for the supervisor to resolve. (ECF No. 53, Ex. L, Goos Dep. 19:21-20:13.) She further testified, however, that she was not trained in what to do when she found conflicting information in the warrant. She just took it upon herself to give such conflicts to her supervisor. (ECF No. 66, Ex. 12, Goos Dep. 11:9-12:14.) Robinson denies that any problem with conflicting or erroneous information is for the supervisor to resolve, asserting that before the policy change regarding SID numbers, the packing clerks had authority and discretion to alter information in a warrant. (*Id*., Ex. 1, Tafoya Dep. 14:11-21, 62:9-63:11; *see also* Ex. 12, Goos Dep. 11:9-12:20.) Further, Goos testified that if there is a question about identity or information in packing a warrant, she brought it to the supervisor. (ECF No. 53, Ex. L, Goos Depo. 26:14-25.) Robinson denies this, pointing out that the supervisor was not contacted when Goos replaced the SID number in the warrant at issue. (ECF No. 66, Ex. 1, Tafoya Dep. 12:16-13:1.)

Tafoya did not recall any situations before the instant case where the wrong person was arrested when corrections were made, although those corrections did not involve using somebody else's name. (ECF No. 66, Ex. 1, Tafoya Dep. 19:1-10.) She testified that when a packing clerk uses somebody else's name, the "confusion begins" and it causes a "snowball effect". (*Id*. 17:22-25.)

Denver has no technological system of double-checks or fail-safes to insure that erroneous information is not mistakenly entered that could fundamentally change a warrant. Before the policy change whereby no SID number could be changed on the warrant, Denver did not technologically limit the type of information that may be manually entered by packing clerks.

Robinson asserts that Denver did not train its employees about what to do when conflicting warrant information was provided. Tafoya and Goos testified that there were no procedures in place to instruct employees what to do in that situation. (ECF No. 66, Ex. 1, Tafoya Dep. 13:2-6; Ex. 12, Goos Dep. 12:2-10.) There was also no training, and the perception in the department was that they were to try to correct the information. (*Id*., Ex. 1, Tafoya Dep. 21:22-22:1.)[6] Denver did not instruct its packing clerks *not* to change the SID number. (*Id.* 19:7-12.)

As to the warrant modified by Goos, Robinson admits that it included a name spelled exactly as his, as well as the same birth date, social security number, height and weight as his. Robinson testified that there was nothing on the face of the warrant that would alert an officer that the warrant was for a person other than Robinson. (ECF No. 53, Ex. C, Robinson Dep. 178:12-15.) He now denies this, asserting that the modified warrant prominently lists case number 2009CR6188 and that Officer Keita wrote that case number on the booking slip in the section marked “charges.” That case is

[6] Goos did, however, receive training on NCIC rules and regulations when she worked at the Aurora Police Department, and in her employment with Denver receives annual NCIC recertification and gets training on any new codes, policies or procedures. (ECF No. 73, Ex. Y, Goos Dep. 32:23-33:4, 34:14-36:7.)

connected to Cagle with various identifiers, not to Robinson. (ECF No. 66, Ex. 4; Ex. 18, Folmar Dep. 57:19-58:13.)

In November 2010, Robinson discovered that his name had been mixed up with someone else for whom a warrant had been issued when a background check was conducted regarding a potential job in Las Vegas, Nevada. Robinson immediately flew from Las Vegas to Denver in an attempt to cure the identity confusion and to clear his name.

On November 13, 2010, Robinson went into DPD headquarters and spoke with front-desk officer Jean Keita [“Keita”]. Robinson communicated to Officer Keita that the warrant was not his warrant, that a warrant had been mistakenly issued in his name, that he had flown in from Las Vegas to cure the mixup in identity, and asked that police compare his fingerprints and biographical information to prove that he was not the man truly sought by authorities.

During his conversation with Officer Keita, Robinson provided his ID. Every identifier on Robinson’s ID and the warrant matched, and Robinson was arrested by Keita at that time. Keita has been trained to compare biographical information from a warrant to a party who presents himself at DPD headquarters in order to attempt to establish that there is probable cause for arrest. He testified that if someone comes into the department and there is a felony warrant, he checks with the ID bureau and NCIC and then arrests the person if they match the information in the warrant (social security number, height, weight). (ECF No. 66, Ex. 17, Keita Dep. 16:9-17:5, 37:16-25, 93:1-

22.) If the person protests that they are not the person on the warrant, it is for the court to sort it out. (*Id.* 39:5-9.)

Thus, Officer Keita testified that even in circumstances where people complain of mistaken identity, he follows the above procedure and does not give them special treatment. (ECF No. 66, Ex. 17, Keita Dep. 37:12-23, 38:7-14, 39:11-40:4.) If everything matches and there is reasonable suspicion that the person matches the description on the warrant, the warrant has to be executed. (*Id*. 39:11:15.) That is what Keita claims happened in this case.

Keita testified that he acted in good faith on the probable cause established by the state district court warrant describing Robinson. Robinson denies that Keita acted in good faith in arresting him, asserting that Keita did not have probable cause to arrest him merely because Robinson's name and biographical information matched the information on the warrant.

At the time of Robinson's arrest, the DPD front-desk computer had computer programs, including PictureLink (also called Webmug") and JMS/TAG. Defendant Keita was able to and did look up Cagle's mugshot after this lawsuit was initiated. (ECF No.66, Ex. 17, Keita Dep. at 87:25, 88:1-6.) Keita testified it was apparent from the Webmug shot of Cagle that he looked nothing like Robinson. (*Id*. 32:3-6.) Also, Chief Horner testified that a comparison of the JMS/TAG photos would have revealed an identity problem. (*Id*., Ex. 5, Horner Dep. 44:22-46:9, 112:1-11.) Robinson asserts, and it appears from the evidence, that the DPD does not train its front-desk officers to utilize or rely on computer programs such as PictureLink/ Webmug when arresting on a

warrant (*id*., Ex. 17, Keita Dep. 88:7-89:3; Ex. 7, Barker Dep. 50:13-51:7, 58:1-17), even in cases of mistaken identity.

Robinson also asserts that criminal case number 09CR6188 clearly belongs to Cagle (ECF No. 66, Ex. 18, Folmar Dep. 57:19-58:13), and should have put a reasonable officer on notice of the identity confusion. Defendants deny this, noting that Robinson's name was listed on the criminal case records of 09CR6188 as an alias. (ECF No. 55, Ex. G p. 1.) They further assert that Cagle's use of Robinson's ID apparently created the "snow ball" effect, which affected the state district court and Goos.

Robinson testified that while Officer Keita had Robinson in custody, he and another unknown officer repeatedly looked back and forth at Robinson, whispered to each other their doubt that Robinson looked like the person they believed should be arrested, and verbally expressed that in the face of such doubt they would "just let the system sort it out." (ECF No. 66, Ex. 2, Robinson Dep. 102:9-17; Ex. 20, ¶ 7.)[7]

Defendants assert that Robinson was arrested on the state district court warrant, case number 2009CR6188. (ECF No. 53, Ex. A, Keita Dep. 69:17-70:3.) Robinson denies that he was arrested "on" a warrant. The arrest booking slip indicates that the basis for the arrest ("charges") was criminal case 2009CR6188. (ECF No. 66, Ex. 3.)[8]

---

[7] Robinson also asserts that despite the fact that Keita took no extra steps to properly identify or distinguish him from the man truly sought by the warrant, Keita had sufficient information to doubt that Robinson was the person sought by the warrant. I find this is not established by the cited evidence.

[8] Robinson also disputes that the warrant was, in fact, issued for him. The state district court's Request/Order for a warrant was for Cagle, Michael aka Robinson, Christian A. (*Id*., Ex. 4 at Bates 103-104.) Also, the original warrant issued by the state district court on September 8, 2010, listed only Cagle's name as the party subject to the warrant. (ECF No. 77, Ex. 3 at p. 3.) As noted earlier, Robinson has not shown that this warrant was transmitted by the state district court to the DSD or the CBI. He also has not

Robinson testified after his arrest that he requested to be fingerprinted. He was taken to another floor and fingerprinted by a middle-aged Hispanic man. Thereafter, the man left and then returned and said the warrant was Robinson's warrant. Robinson was on the floor where fingerprinting was performed for 15 to 25 minutes.

At DPD Headquarters, an officer told Robinson that the bond was $500, and Robinson admits that he had the $500 to bond out. He further admits that the bond amount stated on the warrant is $500. Robinson denies, however, that he could pay the $500 required for bond for fear that if he paid such monies, he would tacitly approve that he was guilty and/or that he was the man for whom the warrant sought. (ECF No. 66, Ex. 2, Robinson Dep. 104:1-19; Ex. 20.)

DSD was notified to pick up Robinson and take him to the Denver Detention Center ["DDC"]. Deputies Jason Cruz ["Cruz"] and Jessica Jaquez ["Jaquez"] transported Robinson from DPD headquarters across the street to the DDC, and were with Robinson for approximately three minutes. Deputy Joseph Armijo ["Armijo"] assisted in processing Robinson into the DDC at the Admissions post. The Admissions post is responsible for inputting information and demographics into the computer and creating the booking number.

Robinson asserts that during the process of being transported and processed into the DDC, he described to the deputies that he was not the person for whom a warrant had been issued and his identity had been confused for someone else. (ECF No. 66, Ex. 2, Robinson Dep. 119:14-23; Ex. 20.)

---

shown that he was arrested in connection with that warrant.

Deputies typically compare height, weight and other warrant descriptors to make sure they have the right person. Defendants also assert that the Prisoner Identity-in-Question Investigation procedure ["PIQ procedure"] (ECF No. 66, Ex. 6) is part of the various intake procedures at the DDC. The PIQ procedure is designed to verify a person's identity when someone complains of mistaken identity. (*Id*., Ex. 7, Barker Dep. 51:8-52:24.)

The PIQ procedure was utilized and logged 99 times from February through December 2010.[9] The PIQ procedure precipitates an inquiry with the DPD ID Bureau regarding warrant identification. Robinson asserts, and Defendants do not dispute, that some sheriff's deputies, including Armijo, were told that they had a duty to initiate an identity investigation to prevent unjustified and unnecessary continuing detentions of innocent persons. Armijo acknowledges being put on notice that an identity investigation procedure was designed to prevent unconstitutional deprivations and that the failure of an officer to implement the procedure could result in a constitutional deprivation of a person who had been mistakenly arrested in their facility.

Defendants asserts that the Defendant deputies had actually used the PIQ procedure before Robinson's arrest, and that this procedure requires a deputy to report to a sergeant when a prisoner complains about identification on an arrest warrant. (ECF No. 53, Ex. O, Cruz Dep. 16:15-17:9, 18:17-19:25; Ex. P, Jaquez Dep. 12:25-13:3, 14:23-16:13; Ex. Q, Armijo Dep. 13:11-14:11, 50:6-11.) Robinson denies that the

---

[9] While Chief Horner testified that the PIQ policy had been done for years, a formal process for it was implemented in 2008. (ECF No. 66, Ex. 5, Horner Dep. 10:16-21; *see also* Ex. 6.)

deputies had previously used the PIQ procedure, arguing that they testified in a conflicting manner about that. He asserts that the deputies appeared confused about the circumstances under which they should initiate the PIQ. (*See* ECF No. 66, Ex. 8, Armijo Dep. 15:6-12, 16:3-20, 25:8-21, 26:2-14; Ex. 13, Cruz Dep. 14: 3-10, 17:10-18:7.) Robinson further notes that although Armijo testified he would report a discrepancy to a supervisor (ECF No. 55, Ex. Q, Armijo Dep. 47:19-23), he failed to report the discrepancy in this case between the warrant and the criminal case number even though he had looked at the criminal case information. (ECF No. 66, Ex. 16.)[10]

Thus, it is undisputed that the PIQ process was not initiated by the deputies that transported Robinson. Indeed, no sheriff's deputy initiated that procedure during the time Robinson was detained. (ECF No. 66, Ex. 5, Horner Dep. 54:4-10; Ex. 25.)

Robinson asserts that if any deputy had initiated a PIQ procedure, he would have been released. While the testimony he cited does not support this (*see* ECF No. 66, Ex. 5, Horner Dep. 44:20-45:3.), Chief Horner did testify to that effect. (*Id*. 54:4-10.) Chief Horner also acknowledged that if the photos of Robinson and Cagle had been pulled up, it would have revealed an identity problem. (*Id*. 42:3-19, 44:22-45:3.) Further, there is evidence that just by "eyeballing" the fingerprints of Robinson and Cagle, a distinctive difference could be noted. (*Id*., Ex. 18, Folmar Dep. 53:6-54:3.)

Chief Horner also testified that if any officer had looked up Robinson's name they would have had access to records that would have created reasonable doubt that two

---

[10] According to Defendants, these court records would not create a discrepancy that would trigger any action as Robinson's name was listed as an alias.

inmates could have the same case number. (ECF No. 66, Ex. 5, Horner Dep. 112:1-7.) He then clarified that by stating that there is a possibility that two inmates could be on the same case number, so that would have raised a warning to look into it further. (*Id*. 112:8-11.) Indeed, in the case records in this case, Robinson's name was listed as an alias. (ECF No. 55, Ex. G p. 1.) Defendants note that Robinson was the "Christian Robinson" in the court records because it was his identity that was used at the first arrest in case no. 2009CR6188.

While Robinson was incarcerated at the DDC, Chief Horner testified that there was no written record of complaints or grievances from Robinson. (ECF No. 53, Ex. I, Horner Dep. 132:7-25.) While Robinson denies this, he does not show that there was such a written record. Robinson testified, however, that he wrote approximately two requests or complaints per day maintaining that his identity had been confused with someone else. (ECF No. 66, Ex. 2, Robinson Dep. 133:14-134:23.)

On Monday, November 15, 2010, the state district court was notified by DSD that the warrant had been executed and a person was in custody, and on that day the state district court set a court appearance for Robinson on November 24, 2010 at 1:30 p.m. Chief Horner testified that when a person comes into the jail or is arrested on a state district court warrant, the state district court is notified promptly. (ECF No. 73, Ex. X, Horner Dep. 130:25-131:3.) The DSD notifies the state district court that it has someone in custody on a state district court warrant, and the state district court does the scheduling. (ECF No. 53, Ex. I, Horner Dep. 18:22-19:2.)

Chief Horner testified that the state district court controls the timing of a court appearance of an arrestee on a state district court warrant, and the DSD acts pursuant to the will of the state district court. (ECF No. 53, Ex. I, Horner Dep. 18:20-19:13; ECF No. 73, Ex. X, Horner Dep. 130:25-131:3.) While Robinson denies this, he has not cited competent evidence to dispute Horner's testimony. He does complain, however, that Denver deliberately relies on a policy that defers the scheduling of court appearances for new arrestees to state district court discretion.

Chief Horner acknowledged that while in a county court matter the arrestee usually appears in court the next day after arrest, it takes longer in the state district court. (ECF No. 53, Ex. I, Horner Dep. 18:9-19:2.) He testified that in a state district court case it could take up to ten days for an appearance. (*Id*. 20:17-22.) Robinson contends that there is competent evidence that Denver could act to shorten this waiting period. The only evidence he cites, however, is Chief Horner's testimony that when a person was severely ill, the DSD had requested a PR bond to get them out as soon as they could. (*Id*. 22:14-23:15.) Robinson also points to testimony that anyone— family, friends, their attorney, can call the court and petition to be seen sooner than scheduled by the court. (*Id*. 27:15-20.) This does not, however, rebut Chief Horner's testimony.

It is undisputed that in Robinson's case, the scheduling of his court appearance by the district court resulted in a twelve-day incarceration before Robinson was given a hearing before a judge. (ECF No. 66, Ex. 5, Horner Dep. 14: 23-25, 15:1-3.) Thus, on November 24, 2010, Robinson appeared on the warrant in the state district court division which issued the warrant. The deputy district attorney agreed that Robinson

was not the person who pled guilty in the case. Robinson was released on a personal recognizance bond. Robinson appeared again in state district court on December 2, 2010, the bond was vacated, and it was noted that Robinson was a victim of ID theft. A motion for factual innocence was prepared for Robinson which was granted by the state court on January 10, 2011.

Robinson asserts at the time he was arrested that Denver knew it had a regularly reoccurring mistaken identity arrest problem. He cites testimony which I summarize as follows. Denver was taking action and adopting standardized procedures regarding cases of mistaken identity because it recognized it could do a better job. (ECF No. 66, Ex. 7, Barker Dep. 19:4-15.) There had been some lawsuits regarding mistaken identity. (*Id*. 19:7-9.) The two biggest problems Denver had regarding identity in question issues were that (1) people lie about who they are and (2) courts typically do not add very much identifying material on a case, making it more difficult for officers to determine who it is they are trying to pick up in relationship to the real suspect on a case. (*Id*. 20:10-21:3.) Chief Horner testified that of the cases where the PIQ procedure was implemented, 60 percent resulted in a determination that it was not the correct person being held. (*Id*., Ex. 5, Horner Dep. at 55:16-56:4-16.)[11]

---

[11] The testimony Robinson cited of Officer Keita does not support his argument. Keita testified that twice per year he does not arrest people on a warrant where they resemble the warrant, but there is a piece of distinguishing information. (*Id*., Ex. 17, Keita Depo. 20:6-21:23.) Robinson also refers to Orders from Case No. 08-cv-01693-MSK-KLM which he asserts indicate recognition of many confirmed mistaken identity arrests (ECF No. 66, Ex. 21). Those, however, are discovery rulings and are not rulings on the merits. Thus, they do not support his argument. Robinson also refers to news articles pertaining to Denver mistaken identity arrests (id., Ex. 24), but newspaper articles are inadmissible on summary judgment. *See Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005) (newspaper articles are classic, inadmissible hearsay, not competent summary judgment evidence); *Miles v. Ramsey*, 31 F. Supp. 2d 869, 876 (D. Colo. 1998).

The DPD has extensive policies regarding probable cause and arrest in the Operations Manual, § 104. Defendants assert that DPD officers are trained to arrest upon probable cause, citing to deposition testimony of Lieutenant Barker. (ECF No. 53, Ex. V, Barker Dep. 69:16-19.) Robinson denies that DPD officers are properly trained to find appropriate "probable cause" in circumstances of mistaken identification, because DPD officers are trained only to check and compare the information on the warrant. (ECF No. 66, Ex. 17, Keita Dep. 37:4-11, 38:1-41:4, 124:3-13.)

DPD officers receive extensive field training on matching warrant descriptors to a suspect. Defendant Keita has had training on the Fourth Amendment, the probable cause standard to arrest, and matching an arrest warrant to a suspect. DPD has a dedicated Bureau to identification matters. Personnel in the ID Bureau include police technicians who are trained and experienced in both practical, general police work and specialized identification matters including fingerprinting.

## III. ANALYSIS

### A. Standard of Review

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit." *E.E.O.C. v. Horizon/ CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). "A dispute over

a material fact is ‘genuine’ if a rational jury could find in favor of the nonmoving party on the evidence presented.” *Id.*

The burden of showing that no genuine issue of material fact exists is borne by the moving party. *Horizon/ CMS Healthcare Corp.*, 220 F.3d at 1190. “‘Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.’” *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted). When applying the summary judgment standard, the court must “‘view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.’” *Id.* (quotation omitted). All doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

In this case, Defendants assert qualified immunity which “is an immunity from suit rather than a mere defense to liability.” *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Under the doctrine of qualified immunity, “government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

“When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established.” *Martinez v. Beggs*, 563 F.3d 1082,

1088 (10th Cir. 2009). The court "has discretion to determine 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Id*. (quoting *Pierson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 818 (2009)). If the defendants did not violate the plaintiff's constitutional rights, the court need not address whether those rights were clearly established. *Id*.

"In determining whether the plaintiff has met his burden of demonstrating a violation of a constitutional right that was clearly established, [the court] will construe the facts in the light most favorable to the plaintiff as the nonmoving party." *Estate of Bleck ex rel. Churchill v. City of Alamosa, Colo.*, No. 12-1139, 2013 WL 5878802, at *2 (Nov. 4, 2013) (citing *Scott v. Harris,* 550 U.S. 372, 378, 380 (2007)). Since the case is "'beyond the pleading phase of the litigation, a plaintiff's verison of the facts must find support in the record.'" *Id*. (quotation omitted).

B. The Merits of the Motion

1. The First Claim - Fourth Amendment Violation Against Officer Keita in His Individual Capacity

Defendants argue that Robinson cannot meet his two-part heavy qualified immunity burden on this claim as Officer Keita had probable cause to arrest Robinson. The Fourth Amendment requires probable cause for arrest. *See Apodaca v. City of Albuquerque*, 443 F.3d 1286, 1289 (10th Cir. 2006). "'Probable cause to arrest exists if, under the totality of the circumstances, the facts and circumstances within the officer's knowledge are sufficient to justify a prudent officer in believing the defendant is engaged in an illegal activity.'" *United States v. Brown*, 234 F. App'x 838, 845 (10th Cir. 2007) (quoting *United States v. Stephenson*, 452 F.3d 1173, 1178 (10th Cir. 2006)).

Probable cause is a "'practical, nontechnical conception'" which deals with probabilities, not "hard certainties". *Illinois . Gates*, 462 U.S. 213, 231 (1983) (quotation omitted). "[T]he evidence . . . must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id*. at 232.

In the qualified immunity context, officers are shielded "from suit for damages if 'a reasonable officer could have believed [the plaintiff's] [arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.'" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson v. Creighton,* 483 U.S. 635, 641 (1987)). "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Id*. (quoting *id*.)

As recognized by Judge Krieger in *Jama v. City and Cnty. of Denver*, No. 08-cv-01693-MSK-KLM, 2010 WL 3615027 (D. Colo. Sept. 9, 2010), the clearly established law governing mistaken identity arrests is set out in *Hill v. California*, 401 U.S. 797 (1971). *Hill* was summarized by Judge Krieger as follows:

> In *Hill*, police officers obtained an arrest warrant for Mr. Hill, which included his age, physical description, and address. When they arrived at Mr. Hill's apartment, Mr. Miller, who fit Mr. Hill's physical description, was present in the apartment but Mr. Hill was not. Despite Mr. Miller's protests that he was not Mr. Hill and production of an identification card indicating he was Mr. Miller, the police officers believed Mr. Miller to be Mr. Hill and arrested him on the warrant for Mr. Hill. They also conducted a search of the apartment incident to the arrest, which resulted in seizure of a number of items that were subsequently used to convict Mr. Hill of robbery.
>
> Mr. Hill appealed his conviction arguing that the evidence was not admissible because Mr. Hill, the subject of the arrest warrant, had not actually been arrested prior to the search. The Supreme Court framed the issue as whether Mr. Miller's arrest was constitutional, because if it was constitutional then the subsequent search was constitutional and the evidence admissible. The Supreme Court concluded that "when the police have probable cause to

> arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." It reasoned that the arrest was a "reasonable response to the situation facing them at the time." To support the finding of reasonableness, the Supreme Court noted that the officers executed the search warrant at Mr. Hill's apartment on a person who met the description of Mr. Hill. The fact that Mr. Miller produced identification showing that he was, in fact, Mr. Miller, did not make the arrest unreasonable because aliases and false identifications are not uncommon.

*Id*., 2010 WL 3615027, at *6. The *Hill* case:

> does not . . . clearly establish, nor even address, what degree of similarity between the suspect and the description in the warrant must be present to make an arrest reasonable, nor when it is reasonable to arrest someone based on the purported use of an alias. Rather, *Hill* provides that reasonable mistakes do *not* constitute constitutional violations, and demonstrates that an arrest based on similarities in descriptors is reasonable even in the face of some contrary evidence that the individual is the person described in the warrant. As such, it cannot serve to put an officer on notice that the arrest of a suspect who has the same name as an alias used by the suspect and matches a warrant's description of the suspect, albeit with some differences, is unconstitutional.

*Id*.

Based on *Hill*, it is clearly established that if police have probable cause to arrest a person, and reasonably mistake someone else for that person, then the arrest of the other person is a valid arrest. *Jama*, 2010 WL 3615027, at *6. It is also "clearly established that mistaken identity arrests are governed by a 'reasonableness' standard—whether the officer's mistake as to the identity was reasonable under the circumstances facing him or her at the time of the arrest." *Id*.

I find in this case that it was reasonable for Officer Keita to arrest Robinson, given the fact that the warrant upon which he was arrested included all of Robinson's identifying information, including his name, birth date, social security number, height, and weight. *See Reyes v. Bd. of County Comm'rs*, No. 06-cv-02319-WDM-BNB, 2008 WL 961565, at 4

(D. Colo. April 8, 2008) ("it was reasonable for the ACDF employees to conclude that Plaintiff was the person named in the warrant, as there were numerous matching identifiers"; no Fourth Amendment violation was found as the facially valid warrant gave the officers sufficient probable cause to arrest and detain plaintiff); *Archuleta v. Wagner*, No. 06-cv-02061-LTB-MJW, 2007 WL 646317, at *5-6 (D. Colo. Feb. 27, 2007) (plaintiff's name was same as alias used by wanted fugitive; booking plaintiff after arrest on warrant, despite claims of innocence and mistaken identity, did not give rise to constitutional claim against booking officer, despite officer's subjective belief that plaintiff might not be named in warrant), *aff'd*, 311 F. App'x 113 (10th Cir. 2009); *see also Brown v. Patterson*, 823 F.2d 167, 169 (7th Cir. 1987) ("If, as here, an arrest warrant, regular on its face, is duly issued, the officer executing the warrant does not violate the Fourth Amendment by arresting the wrong person, unless the officer acts unreasonably. . . . As the warrant did not violate the Fourth Amendment by containing an inaccurate or too general description of the person to be arrested", the officer was found to have acted reasonably.). No independent constitutional requirements exist for matching warrant descriptors to a suspect, and Robinson has not identified any authority that requires that.

Robinson acknowledges that a warrant normally could provide sufficient information for a field officer to make a reasonable determination, in good faith, that there was probable cause to arrest a suspect. He argues, however, that in a circumstance where an officer is safe, with time and resources at his disposal at the police department headquarters front desk, no reasonable front-desk officer would ignore the communication of a citizen who came into headquarters and stated that the warrant that might be used to compare

identifying information erroneously identified him. In other words, he argues that Office Keita failed to act as a reasonable officer would when conducting a probable cause identity investigation, and that Keita demonstrated deliberate indifference to Robinson's constitutional right to be free from unjustified detention when he failed to use resources available at the front desk to confirm/deny the existence of probable cause regarding Robinson's identity, arrested him within minutes of his mistaken identity communication, and left "the system to sort it out."

I reject Robinson's argument, finding that he has not cited clearly established authority for the proposition that Keita had a duty to further investigate Robinson's mistaken identity contention once he matched the identifiers on the warrant. Again, I find the *Jama* case instructive on the issue. In *Jama*, as in this case, the plaintiff claimed "that it was unreasonable for the Officers to not further investigate once Mr. Jama expressed his innocence and/or they developed doubt that Mr. Jama was in fact Mr. Alia", the person named on the warrant. 2010 WL 3615027, at *7. Judge Krieger noted that this was a "troubling" allegation "because it appears that the [DPD] had the means by which to investigate Mr. Jama's claims of mistaken identity, but did not." *Id*. at 7 n. 1. However, she found it was "not clear that either of these Officers [whose involvement ended either when Mr. Jama was arrested or was transported to the jail] had a clearly established obligation to do so." *Id*. Since the plaintiff cited no authority "establishing that the Officers had such a duty", Judge Krieger found that "Mr. Jama has not met his burden of establishing that the Officers' failure to investigate his claims of innocence (or their own subjective doubts) as to his guilt, was a violation of the Fourth Amendment and, therefore, the Officers are

entitled to qualified immunity. . . ." *Id*. As in *Jama*, Robinson has not cited authority that Officer Keita's failure to further investigate his claim of innocence after Keita matched the identifiers on the warrant was a constitutional violation.

Moreover, cases have routinely found that a failure to investigate a claim of innocence under similar circumstances does not give rise to a Fourth Amendment violation. The key case on this issue is the Supreme Court's decision in *Baker v. McCollan*, 443 U.S. 137 (1979). In *Baker*, as here, the plaintiff asserted a § 1983 claim based upon his arrest pursuant to a warrant. *Id*. 141-42. The warrant was issued for the plaintiff but was based on conduct by his brother, who had stolen the plaintiff's driver's license. *Id*. Despite the plaintiff's protests of mistaken identity, he was detained for three days. *Id*. at 144. When officers eventually ascertained the validity of the plaintiff's protests, he was released. *Id*.

The Supreme Court in *Baker* affirmed dismissal of the § 1983 claim for violation of the plaintiff's Fourth Amendment rights. 443 U.S. at 147. The court noted that Baker was arrested pursuant to a facially valid warrant, and found that the plaintiff's claim that the officer arresting him should have investigated his claim of mistaken identity did not give rise to a constitutional violation. *Id*. at 143-44. In so finding, the Court noted that the plaintiff's "innocence of the charge contained in the warrant, while relevant to a tort claim of false imprisonment. . ., is largely irrelevant to his claim of liberty without due process of law." *Id*. at 145. That is because "[t]he Constitution does not guarantee that only the guilty will be arrested." *Id*. "'Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person.'" *Id*. (quotation omitted). The Court then stated:

> Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to independently investigate every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent. Nor is the official charged with maintaining custody of the accused named in the warrant required by the Constitution to perform an error-free investigation of such a claim. The ultimate determination of such claims of innocence is placed in the hands of the judge and the jury.

*Id*. 145-146.

The Tenth Circuit relied on the *Baker* decision in *Romero v. Fay*, 45 F.3d 1472 (10th Cir. 1995), where the plaintiff claimed that the defendants "falsely imprisoned him by conducting an inadequate investigation into the facts forming the probable cause to arrest him for the murder of David Douglas." *Id*. 1480. Among other things, the plaintiff argued that defendants falsely imprisoned him by refusing to release him when he repeatedly protested his innocence. *Id*. The Tenth Circuit rejected this argument, finding under *Baker* that "[o]nce Defendants concluded that the initially discovered facts established probable cause, they were under no obligation to forego arresting Plaintiff or release him merely because he said he was innocent." *Id*.; *see also Marx v. Gumbinner*, 905 F.2d 1503, 1507 n. 6 (11th Cir. 1990) ("[The police officers] were not required to forego arresting [plaintiff] based on initially discovered facts showing probable cause simply because [plaintiff] offered a different explanation); *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988) ("A policeman ... is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause."). Based on the foregoing, I find that Robinson has not shown a constitutional violation by Officer Keita.

Robinson also asserts, however, that he was seized pursuant to an erroneously issued warrant that should have been issued for Cagle. He argues that an erroneously issued warrant cannot provide probable cause for an arrest, relying on *Berg v. County of Allegheny,* 219 F.3d 261, 276 (3rd Cir. 2000) and other cases. I find the *Berg* case distinguishable as to this argument, as the plaintiff there had no connection to the criminal case out of which the warrant was issued. *Id*. at 266-67. *Berg* relied on *Whiteley v. Warden*, 401 U.S. 560 (1971), in which the warrant was improperly issued by a justice of the peace solely on a conclusory statement of a sheriff. That is certainly not the situation here. More importantly, I find that the cases relied on by Robinson, all of which are from outside the Tenth Circuit, do not constitute clearly established authority in support of Robinson's claim against Officer Keita. Instead, I find that the *Baker* case is controlling under these facts. *See Archuleta v. Wagner*, 2007 WL 646317, at *5-6) (applying *Baker* and surveying the case law).

Based on the foregoing, I find that Robinson has not met his burden of demonstrating a violation by Officer Keita of a constitutional right that was clearly established. Accordingly, I find that Officer Keita is entitled to qualified immunity, and grant summary judgment on the first claim for relief.

2. <u>The Second Claim - Due Process Violation Against Deputies Jaquez, Cruz and Armijo</u>

I also find that the deputy Defendants are entitled to qualified immunity in connection with the due process claim asserted against them. Robinson alleges that the deputies deprived him of liberty without due process of law by ignoring his claims of innocence and deliberately failing to initiate the PIQ procedure. (*See* Am. Compl. ¶ 42.) I note as to the

actual acts of transporting and booking Robinson into the DDC that it is undisputed that Robinson's name is on the warrant, as is his birth date, social security number and other identifying information. The arrest was made by Keita, and the deputies merely enforced the warrant by transporting Robinson to the DDC where he was processed and booked.

Robinson argues, however, that there is a history of mistaken identification cases that have recognized a person's right to be free from continued detention after an initial mistaken identity arrest. While he acknowledges that the Tenth Circuit has not yet found occasion to recognize the right, he argues that the Supreme Court has identified the right and at least four circuit courts have followed in development of the contours of the right. Robinson asserts that these and other cases demonstrate that the right may be violated by law enforcement's conduct in continuing to detain a suspect while he knew or should have known that the detainee is entitled to release. The primary method of violating a person's rights in this context, according to Robinson, is ignoring a detainee's repeated pleas that his/her identity have been confused with someone else over a prolonged period of time. Robinson contends that such conduct shows deliberate indifference to the risks of unjustified detention and such indifference is the reason that the deputies were added as parties in the Amended Complaint. From these allegations, it appears that Robinson is asserting a substantive due process claim.

I now turn to the cases relied on by Robinson. I first address the *Baker* case, which I find is the controlling case on this issue. As discussed previously, the Supreme Court in *Baker* noted that a sheriff executing an arrest warrant is not required by the Constitution to investigate independently every claim of innocence, whether the claim is based on

mistaken identity or not. 443 U.S. at 145-46. Relevant to the claim against the deputies, *Baker* also noted that the official charged with maintaining custody of the accused named in the warrant, in this case the deputies, is not required by the Constitution to perform an error-free investigation of such a claim. *Id*. at 146.

The Supreme Court in *Baker* found no Fourteenth Amendment violation where a person was wrongfully detained based upon mistaken identity for three days. It acknowledged, however, in dicta that there could be limits to the period of detention, stating, "[o]bviously… one could not be detained indefinitely in the face of repeated protests of innocence… detention pursuant to a valid warrant but in the face of repeated protests of innocence will, after a lapse of a certain amount of time, deprive the accused of liberty without due process of law". *Baker*, 443 U.S. at 144-145. Robinson relies on this in arguing a constitutional violation based on his twelve day detention.

The deputies' involvement with Robinson's detention, however, appears to have been very brief. Jaquez and Cruz transported Robinson from the DPD headquarters across the street to the DDC, and Armijo assisted in booking and processing Robinson into the DDC. No further contact with the deputies at the DDC is alleged and no evidence has been provided of any further contact. There is no evidence showing that Armijo, Jaquez or Cruz were involved in the decision to continue to detain Robinson after their initial involvement was over, nor is there an allegation or evidence that they had the authority to release Robinson. *See Patton v. Przybylski*, 822 F.2d 697, 700 (7th Cir. 1987) (finding no constitutional violation against police officer who reasonably arrested the plaintiff on a warrant even though the plaintiff was held for five days "over his vigorous protest that he"

was the wrong man as "there was no suggestion that [the officer] continued to exercise a baleful influence over" the plaintiff's destiny after he "was carted off to Cook County Jail").

Moreover, even if the deputies could be assumed to be responsible for the detainment of Robinson for the full twelve day period, the language relied on in *Baker* is dicta and provides no concrete guidance on what specific conduct would rise to the level of a due process violation, including how long one would need to be detained for a constitutional violation to occur. Thus, it cannot constitute clearly established law as it would not alert a reasonable official as to the contours of the right.

Robinson also cites cases from other Circuits to support his argument that the right at issue was clearly established. Robinson argues in the cases that the officer or jailer responsible for continued detention of a suspect failed to take action to utilize or compare information that was available and which should have put the defendant on notice that the detainee was entitled to release. The cases found that incarceration durations ranging from seven (7) to sixty-eight (68) days were severe enough to qualify as Fourteenth Amendment violations. Together, Robinson argues that these cases have developed the contours of the Fourteenth Amendment right against continued detention in the mistaken identity context and demonstrate a great weight of circuit authority clarifying a "right to be free from continued detention after it is known or should have been known that a detainee is entitled to release." (*See* Pl.'s Resp. to Defs.' Mot. Dismiss, at 7.) I now turn to those cases.

I first address *Cannon v. Macon County,* 1 F.3d 1558 (11th Cir. 1993), which is probably the strongest case in support of Robinson's argument. There, an arrestee brought a § 1983 action alleging that her arrest and seven-day incarceration on the basis

of her misidentification as a fugitive violated her due process rights. *Id*. at 1560-61. As here, the plaintiff alleged that she repeatedly maintained to the defendants that she was not the person they thought she was. *Id*. The court noted that "Cannon's § 1983 claim . . . is essentially a claim of false imprisonment rising to the level of a liberty deprivation", and recognized that "[a]t the time of the relevant conduct, Cannon had a clearly established right against false imprisonment without due process." *Id*. at 1562. However, the facts of *Cannon* are distinguishable from this case.

In that case Cannon, then known as Mary Rene Parrot, was arrested after a sheriff's deputy got a "hit" from the NCIC that a Mary E. Mann ["Mann"], a.k.a Mary E. Parrot, was wanted. *Cannon*, 1 F.3d at 1560. The deputy transported Cannon to the jail, where he left the arrest report for Deputy Collins to complete. *Id*. Collins completed the arrest report and presented an affidavit to a judge "that served as the basis for the issuance of the fugitive warrant for Cannon's arrest." *Id*. at 1565. Collins took this action despite the fact that Cannon repeatedly claimed she was not Mann, the sheriff's office had Cannon's driver's license and other identifying information on file, the information on the driver's license differed significantly from the description for Mann, Cannon's physical description did not match Mann's description, and while Collins initially claimed that he got the information for the arrest report from Cannon, he later "conceded that it was possible that he obtained some of the information from the NCIC report rather than from Cannon." *Id*. at 1563-64. The court found that the jury was presented with substantial evidence that Collins unreasonably violated Cannon's clearly established right, holding that:

> at the time of Cannon's incarceration, and considering all the evidence in the light most favorable to Cannon, a reasonable official in Collins' position would

> have known that Collins' conduct could violate Cannon's fourteenth amendment right not to be falsely imprisoned. A reasonably well trained officer would have at least attempted to obtain information from Cannon for purposes of filling out Cannon's arrest report, rather than copying data from an NCIC computer printout. A reasonable official also would be unlikely, in the face of Cannon's assertions of mistaken identity, to sign an affidavit swearing to a belief that Cannon was a wanted fugitive without taking any steps to verify that belief.

*Id*. at 1565.

In the case at hand, unlike *Cannon*, the warrant used to arrest and detain Robinson appeared to be facially valid and the deputies were simply enforcing the warrant by transporting Robinson to the DDC where he was processed and booked. The deputies did not sign any affidavit or make representations regarding Robinson's identity. Moreover, unlike *Cannon*, there are no allegations from which I can draw the inference that the deputies as reasonably trained officers should have attempted to obtain further information about Plaintiff before transporting him to the DDC. Given the factual differences between the two cases, I cannot say that *Cannon* supports a finding that a reasonable official in the deputies' positions would have known that their conduct violated a Fourteenth Amendment right not to be falsely imprisoned without due process.

I next address *Fairley v. Luman,* 281 F.3d 913 (9th Cir. 2002), where Fairly was detained by the police and held for 12 days on outstanding warrants for the arrest of his twin brother. *Id*. at 915. An officer approved Fairley's booking on the warrants based on the similarity in the physical descriptions alone of the twins. *Id*. Despite Fairley's protests of innocence and statements that his twin was the person they wanted, the police failed to conduct a fingerprint comparison or a Department of Motor Vehicles check during his detention, either of which "would have immediately alerted the City it had the wrong man."

*Id*. While the court found that "'an individual has a liberty interest in being free from incarceration absent a criminal conviction'" and that Fairley "had a liberty interest in being free from a twelve-day incarceration without any procedural safeguard in place to verify the warrant he was detained on was his and in the face of his repeated protests of innocence", *id*. at 918 (quotation omitted), the case addressed only the municipality's liability in connection with a policy or procedure, as the individual defendants were exonerated at trial. *Id*. at 916. As such, I fail to see how that case could provide notice to a reasonable official in the deputies' position that their conduct in transporting Robinson and booking him violated a clearly established right.

In *Russo v. City of Bridgeport,* 479 F.3d 196 (2nd Cir. 2007), the plaintiff was arrested based on mistaken identity and held for 217 days. During that period, the police had in their possession a videotape that showed the perpetrator, unlike Russo, had no tattoos as well as information that the physical characteristics of the perpetrator differed from Russo. Russo repeatedly protested his innocence and requested that the officers view the videotape. The Second Circuit dismissed the false arrest and false imprisonment cases because the plaintiff was arrested on a facially valid warrant. While the court denied summary judgment as to Russo's claim based on an unreasonably prolonged detention, this was based on the "individual defendants-appellees' alleged mishandling of exculpatory evidence and failure to turn that evidence over to the prosecuting attorney which, in turn, prevented the prosecutor from complying with his duty to give the exculpatory evidence to the defense." *Russo*, 479 F.3d. at 205. The right the court found was clearly established was the "right to be free from prolonged detention caused by law enforcement officials'

mishandling or suppression of exculpatory evidence in a manner which 'shocks the conscience.'" *Id*. at 211. This again is factually distinct from this case.

Finally, in *Lee v. City of Los Angeles,* 250 F.3d 668 (9th Cir. 2001), a mentally disabled person named Kerry Sanders was incorrectly identified as fugitive Robert Sanders. *Id*. at 676. As a result, he "was extradited from California to New York in October 1993 and incarcerated" until October 1995 when it was learned that the real Robert Sanders had been arrested another jurisdiction. *Id*. Thus, Kerry Sanders was incarcerated for two years. The plaintiffs alleged that the defendants "ignored his 'obvious' mental capacity and failed to take any steps to identify him before arresting him as Robert Sanders pursuant to a fugitive warrant." *Id*. at 684. Indeed, he was arrested under a warrant with a different name—Robert Sanders—and his identifying characteristics did not match those of Robert Sanders. *Id*. at 685. The plaintiffs alleged that "had defendants in any other way verified the identity of the man they had in custody, Kerry Sanders would not have been arrested, extradited, or incarcerated as Robert Sanders." *Id*. at 676-77. Here, unlike in *Lee*, Plaintiff was arrested on what appeared to be a facially valid warrant, and steps were taken to match the information on the warrant to Robinson's information.[12]

[12] The other cases are also distinguishable. I previously discussed the Seventh Circuit's decision in *Patton.* In *Sanders v. English*, 950 F.2d 1152 (5th Cir. 1992), the plaintiff claimed that he was illegally detained by an officer who "knowingly and willfully ignored substantial exculpatory evidence" that he had arrested the wrong man. *Id*. at 1162. The court found that the officer's "deliberate failure to disclose this undeniably credible and patently exculpatory evidence to the prosecuting attorney's office plainly exposes him to liability under § 1983." *Id*. In this case, there is no evidence that the deputies had exonerative evidence that they failed to turn over. *Douthi v. Jones*, 619 F.2d 527 (5th Cir. 1980) involved a situation where a sheriff's department imprisoned the plaintiff for 30 days beyond a court ordered sentence without a valid commitment order. *Id*. at 532. Since the sheriff's department did not have a good faith belief that it could continue to hold the plaintiff, it was denied qualified immunity. *Id*. at 532-37. Again, that is not the situation here.

Based on my analysis of these cases, I find that they are factually distinguishable from this case. I further find that Robinson has failed to show that these cases constitute a consensus of persuasive authority outside of the Tenth Circuit which makes it apparent that in the light of pre-existing law a reasonable officer would have known that the conduct here violated Robinson's constitutional rights.

Robinson also argues that the deputies' failures were similar to those in *Reyes v. Bd. of County Comm'rs*, No. 06-cv-02319-WDM-BNB, 2008 WL 961565 (D. Colo. April 8, 2008), but that the facts are even more egregious than in that case. I disagree, and find that the *Reyes* decision does not help Robinson. The court in that case granted qualified immunity to police officers on the plaintiff's Fourteenth Amendment due process claim, finding that the plaintiff's detention from November 18 to December 1 was not unduly long. *Id.* at *5. The time frame of the detention in that case is similar to this case. The court also found that the defendants did not engage in behavior that shocks the conscience, as required to assert a substantive due process claim. *Id*. At most, the defendants "negligently failed to discover that Plaintiff was not the fugitive named in the warrant. . . .", as they "could have discovered that Plaintiff was not the wanted fugitive if they had taken further steps." *Id*. Again, that appears to be the situation here. While *Reyes* acknowledged the decisions in *Fairly, Cannon, and Russo*, it found that the cases were factually distinguishable and thus did "not help Plaintiff's claim to survive", just as I did. *Id*.

Finally, Robinson argues that the deputies violated his Fourteenth Amendment rights by engaging in conduct that disregards a known, specific risk of harm when they transported and booked him for detention while ignoring his pleas of innocence. He cites

*Medina v. City and County of Denver*, 960 F.2d 1493 (10th Cir. 1992) and *Romero v. Fay*, 45 F.3d 1472 (10th Cir. 1995). Neither of those cases supports Robinson's position, and I find they would not have put a reasonable official on notice that the conduct at issue herein would give rise to liability. Indeed, neither case is even remotely similar to this case factually. *Medina* involved a bystander's claim against Denver and several of its police officers for injuries sustained when the bystander was struck by a suspected felon during a high speed automobile chase. 960 F.2d at 1494. *Romero* involved a warrantless arrest where the plaintiff was implicated in a murder. 45 F.3d at 1474.

Moreover, the *Romero* case actually supports a finding of qualified immunity. It held that the defendant's "failure to investigate Plaintiff's alleged alibi witnesses did not negate the probable cause for the warrantless arrest in the absence of a showing that Defendant Fay's initial probable cause determination was itself unreasonable." 45 F.3d at 1478. I already found in connection with Officer Keita that the decision to arrest Robinson based on the warrant was reasonable. *Romero* also held in regard to a three month detention that the "judicial system represents the proper forum in which to determine the innocence of an arrestee, Defendants' refusal to release Plaintiff when he maintained his innocence does not exhibit deliberate or reckless intent to falsely imprison him." *Id*. at 1481.

Based on the foregoing, I find that Robinson has not shown that Deputies Armijo, Jaquez or Cruz's conduct violated clearly established constitutional rights of which a reasonable person would have known. It was not apparent in light of pre-existing law, including *Baker* and *Reyes*, that reasonable officers would have known that the conduct in question violated a constitutional right. *See Green v. Post*, 574 F.3d 1294, 1300 (10th

Cir. 2009). Thus, I find that the deputies are entitled to qualified immunity in connection with the claim asserted against them.

Moreover, I note that the Tenth Circuit has held that officers can, on an objectively reasonable basis, rely on the collective information of law enforcement. *See Stearns v. Clarkson*, 615 F.3d 1278, 1286 (10th Cir. 2010) ("the assisting officer is not required to second-guess the requesting officer's probable cause determination, nor is he required to independently determine that probable cause exists. . . .Rather, 'a police officer who acts in reliance on what proves to be the flawed conclusions of a fellow police officer may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable.'") (quotation omitted). Here, given the limited actions of the deputies in enforcing what they thought was a facially valid warrant with Robinson's identification information, qualified immunity may also be appropriate on this basis.[13]

At most, it appears from the facts at issue that the deputies violated a law enforcement agency (DSD) policy in regard to not initiating the PIQ procedure. This does not equate to a constitutional violation. *See Hovater v. Robinson*, 1 F.3d 1063, 1068 n. 4 (10th Cir. 1993). "Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision. *Davis v. Scherer*, 468 U.S. 183, 194 (1984); *see also Herring v. Keenan*, 218 F.3d 1171, 1180 (10th Cir. 2000).

---

[13] The deputies could also have reasonably believed that they were entitled to absolute immunity in enforcing the court-ordered warrant by transporting and booking Robinson. *See Moss v. Kopp*, 559 F.3d 1155, 1163 (10th Cir. 2009) ("'officials charged with the duty of executing a facially valid court order enjoy [ ] absolute immunity from liability for damages in a suit challenging conduct prescribed by that order'") (quotation omitted).

Based on the foregoing, summary judgment is granted as to Claim Two. Defendants Armijo, Jaquez, and Cruz are entitled to qualified immunity.

3. The Third and Fourth Claims - Municipal Liability

The Tenth Circuit has indicated it will not hold a municipality "liable for constitutional violations when there was no underlying constitutional violation by any of its officers." *Olson v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002); *see also Ellis v. Ogden City*, 589 F.3d 1099, 1104-05 (10th Cir. 2009) (once the claims against the officers are properly dismissed, the claims against the municipality are also property dismissed); *Cordova v. Aragon*, 569 F.3d 1183, 1193 (10th Cir. 2009) (to succeed on a § 1983 claim against a municipality, a plaintiff must first show that a municipal employee committed a constitutional violation). Thus, Robinson's argument that Denver is liable because it failed to train its front-desk officers to conduct a reliable identity and/or probable cause investigation, to implement the PIQ procedure and/or to train its employees to utilize the PIQ procedure fails because there was no underlying constitutional violation and Denver cannot be vicariously liable for the acts of its employees. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013).[14]

Notwithstanding the above, a municipality can be independently "liable when enforcement of its policies causes a constitutional deprivation." *Christensen v. Park City*

[14] Further, I find that Robinson has "failed to show, as the law requires, that 'the need for more or different training [was] so obvious'" that a violation of constitutional rights was likely to result from the alleged failures of Denver. *Id*. at 773-74. I also note that "[e]vidence that police officers violated certain policies is not sufficient to show the officers were inadequately trained. . . because 'a municipality's failure to train must reflect a deliberate or conscious choice by the municipality.'" *Ibarra v. City of Tahlequah*, No. 12-CV-0098-JHP, 2013 WL 1991546, at *11 (E.D. Okla. 2013) (quoting *Zuniga v. City of Midwest City*, 68 F. App'x 160, 164 (10th Cir. 2003) (further quotations omitted)).

*Mun. Corp.*, 554 F.3d 1271, 1279 (10th Cir. 2009). "'[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.'" *Id*. (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "'Local governing bodies, therefore, can be sued directly under § 1983 ... where ...the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the local government] body's officers.'" *Id*. (quoting *Monell*, 436 U.S. at 690.) A plaintiff must "'identify a specific deficiency' that was obvious and 'closely related' to his injury,. . .so that it might fairly be said that the official policy or custom was both deliberately indifferent to his constitutional rights and the moving force behind his injury." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) (quotation omitted).

In the case at hand, Robinson refers to an alleged policy of deferring to the state district court to schedule court appearances. He asserts that Denver "clings to a policy that affirmatively violates detainees [sic] Constitutional rights by requiring them to be held for an average of 10 days before such arrestees are presented to a neutral magistrate for a judicial determination of probable cause." (Pl.'s Resp. to Mot. Summ. J. at 31.) While on its face this argument refers to a policy, Robinson has not alleged the implementation or execution of an actual policy statement, ordinance, regulation, or decision officially adopted and promulgated by Denver's officers as to this issue. To the extent Robinson relies on the failure to make a policy under these circumstances, *i.e.*, to simply defer to the state district court, I find that Robinson has not shown deliberate indifference. There is no evidence to

suggest that Denver's reliance on the state district court to schedule a hearing after being promptly advised of a warrant arrest was substantially certain to result in a constitutional violation. *See Bryson v. City of Okla. City*, 627 F.3d 784, 789 (10th Cir. 2010).[15] Accordingly, I also find that summary judgment is appropriate as to this portion of the municipal liability claims.

Finally, Robinson alleges that Denver: (1) failed to train its clerks in how to process seemingly conflicting information that could change the target of a warrant, and (2) failed to implement fail-safes, double-checks and/or technological information to prevent the entry of erroneous warrant information that may change the target of the warrant. "Municipal liability may be based on injuries caused by a failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused." *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1189 (10th Cir. 2010). The Tenth Circuit has explained the evidence required to establish deliberate indifference when the municipality fails to train or act:

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately

[15] The cases relied on by Robinson are distinguishable because they dealt with situations where the jail either failed to schedule a court appearance or relied on the court to schedule an appearance and no appearance was scheduled, leaving the plaintiff in prison for a substantial period of time before the jail realized the error. *See Jayes v. Faulkner Cnty.*, 388 F.3d 669, 674-75 (8th Cir. 2004); *Armstrong v. Squadrito*, 152 F.3d 564, 578-79 (7th Cir. 1998); *Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999); *McDonald v. Dunning*, 760 F. Supp. 1156, 1163-64 (E.D. Va. 1991). Here, it is undisputed that Denver promptly scheduled a hearing for Robinson. While Robinson does not agree with the timing of the hearing set by the state district court, he has not shown that this timing rises to the level of a constitutional violation. The 48-hour period that Robinson relies on is only applicable to a probable cause determination where there is a warrantless arrest, unlike here. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 49 (1991); *Baker v. McCollan*, 443 U.S. 137, 143 (1979); *Lingenfelter v. Bd. of Cnty. Commr's*, 359 F. Supp. 2d 1163, 1169-70 (D. Kan. 2005).

> chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Bryson*, 627 F.3d at 789.

I find that a reasonable jury could find that Denver had actual or constructive notice that its failure to train as to how to process conflicting information during the packing process was substantially certain to result in a constitutional violation, and that Denver consciously or deliberately chose to disregard the risk of harm. I also find this is true with regard to Denver's failure to implement fail-safes, double-checks and/or technological information to prevent the entry of erroneous warrant information that may change the target of the warrant.

Robinson has shown that Denver had no training procedures in place as to what packing clerks should do when they received seemingly conflicting or inaccurate information in a warrant. Further, at the time of Robinson's arrest, the packing clerks had complete discretion to change information in a warrant, even the SID number which Denver has acknowledged is the most important piece of identification information in a warrant. That number allows law enforcement personnel to correctly connect fingerprint, mugshot and other key identifying information to the "body" seized. Denver admitted that an incorrect adjustment to a warrant during the "packing" process could result in fundamental changes to the warrant, including a change in whom the warrant had been issued for.

There is also evidence that the packing clerks did change information in the warrants they received, including SID numbers and names that had been incorrectly entered. While this appears to have been infrequent, it does seem to present at least a limited pattern of conduct that Denver has acknowledged could result in a change in the person for whom the warrant was issued, *i.e.*, a warrant for the arrest of the wrong person.

Further, I find that a violation of federal rights was a highly predictable or plainly obvious consequence of Denver's failure to train and inaction, as Denver failed to train its packing clerks in specific skills needed to handle recurring situations where conflicting information was received in a warrant. This presents an obvious potential for constitutional violations as a warrant could be changed at the discretion of a packing clerk and without any double-checks in a manner that results in the wrong person being arrested and detained. Indeed, Goos' change of the SID number in the warrant resulted in the wrong person being arrested, and was the moving force behind Robinson's injuries.

I find particularly instructive the Third Circuit's decision in *Berg v. County of Allegheny,* 219 F.3d 261 (3rd Cir. 2000). In *Berg,* a warrant clerk responsible for issuing and clearing arrest warrants was given an arrest sheet that contained information for the arrest of Paul Banks, including Banks' offense, date of birth, criminal complaint number, social security number, and address. *Id*. at 266. While inputting the information into the computer, the clerk transposed two digits in the criminal complaint number. This resulted in her pulling up the criminal complaint number of Berg and Berg's identifying information. *Id*. While the information shown on the computer screen relating to Berg was different than the information for Banks on the arrest warrant information sheet, the clerk noticed only that

the address was different. *Id*. at 267. Concluding that the court system "contained an old or otherwise incorrect address for Banks", the clerk "manually changed the information", replacing the plaintiff's address with Banks' old address. *Id*. Because of her "clerical error, and her subsequent decision to change the information contained in the ICIS, an arrest warrant was issued for Berg rather than Banks." *Id*.

Berg contended that the county was liable because of its failure to provide sufficient procedural or technical safeguard against errors such as the one that resulted in his arrest. *Berg*, 219 F.3d at 276. The record contained "no evidence of procedures guarding against" the clerk's mistake, and there were no double checks to ensure that warrants were issued in the correct name. *Id*. The Third Circuit held that the county may be liable under those circumstances, stating:

> Having employed a design where the slip of a finger could result in wrongful arrest and imprisonment, there remains an issue of fact whether the County was deliberately indifferent to an obvious risk. The County's failure to provide protective measures and fail safes against Demko's mistake seems comparable to "a failure to equip law enforcement officers with specific tools to handle recurring situations." . . . When such a simple mistake can so obviously lead to a constitutional violation, we cannot hold that the municipality was not deliberately indifferent to the risk as a matter of law.

*Id*. at 277. The Third Circuit made this holding despite the fact that this problem had never previously occurred, as alleged in this case. *Id*. at 267.

As in *Berg* , Denver's failure to provide training or double-checks against the mistake made by Goos in this case, *i.e.*, the changing of the SID number resulting in Robinson's arrest, seems comparable to a failure to equip its law enforcement officers with tools to handle recurring situations. Her mistake in changing the SID number led to Robinson's wrongful arrest and imprisonment. Thereafter, Denver instituted a more stringent

procedure whereby SID numbers could not be changed by the packing clerks. Under these circumstances, I find that there are genuine issues of material fact as to whether Denver was deliberately indifferent that require me to deny summary judgment on this portion of the municipal liability claim. *See also Milligan v. United States*, 644 F. Supp. 2d 1020 (M.D. Tenn. 2009).

## III. CONCLUSION

Based upon the foregoing, it is

ORDERED that Defendants' Motion for Summary Judgment (ECF No. 53) is **GRANTED IN PART AND DENIED IN PART**. It is **GRANTED** as to the first and second claims against Officer Jean Keita, Deputy Joseph Armijo, Deputy Jessica Jaquez, and Deputy Jason Cruz. Defendants Keita, Armijo, Jaquez, and Cruz are dismissed from the case and shall hereafter be taken off the caption. It is **DENIED** as to the portion of the municipal liability claims against the City and County of Denver asserting liability based on the failure to train its warrant clerks in how to process conflicting information and its failure to implement fail-safes, double-checks and/or technological information to prevent the entry of erroneous warrant information that may change the target of the warrant.

Dated: February 20, 2014

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge